**Aircraft Seat Charter Agreement**



BETWEEN:

**FLYJET LIMITED**
Le Méridien,
North Terminal
London Gatwick Airport
West Sussex.
RH6 0PH

(herein referred to as 'Carrier')

AND:

**C FIRST CLASS CORPORATION**   (ATOL: ............)
Ft Lauderdale International Airport
1100 Lee Wagener Boulevard
Suite 326
Ft. Lauderdale
Florida
33315
USA

(herein referred to as 'Charterer')

WHEREAS the Charterer wishes to purchase from the Carrier seats on Flights and the Carrier is willing to make available to the Charterer seats on Flights on and subject to the terms of this Agreement.

IT IS HEREBY AGREED THAT
The Carrier will make available to the Charterer the aircraft seats and services as specified in the Schedules subject to and in accordance with the General Conditions

The Charterer will purchase from the Carrier aircraft seats and services as specified in the Schedules and will comply with its obligations as set out in the General Conditions.

SIGNED for and on behalf of the Carrier:

Name: Shaun Dewey

Title: Director

Date: 04 Th June 2005

SIGNED for and on behalf of the Charterer:

Name: Robert Massey

Title: PRESIDENT

Agreement No : 182 C First Class Corporation            1

## Aircraft Seat Charter Agreement



**General Conditions**

**1.0  Definitions**

1.1  The following definitions apply to this agreement unless the context otherwise requires:-

(i)  'Agreement' means this Aircraft Seat Charter Agreement including these Conditions and the other Schedules thereto.

(ii)  'Aircraft' means an aircraft of the type described in Schedule 2 to the Agreement or any alternative aircraft substituted under the terms of the Agreement.

(iii)  'Charter Price' means the charter price specified in Schedule 2 plus without limitation, any applicable surcharges passenger taxes security air passenger duty and/or passenger insurance charges and levies.

(iv)  'Flight' shall mean each of the flights specified in Schedule 2.

(v)  'Conditions' means the General Conditions as set out in this Schedule and any special conditions appearing in any other Schedules to the Agreement.

(vi)  'Traffic Documents' means all passenger tickets and baggage checks, airwaybills and other documents issued or required under any applicable law or convention.

(vii)  'Carrier' means Flyjet Limited and/or the actual air transport undertaking (if any) to which the Carrier subcontracts performance of any of he Flights.

(viii)  'Charterer' means the party named as Charterer in the Agreement.

(ix)  'Sub-Charterer' means any party entering into an agreement directly with the Charterer for the purchase of seats chartered pursuant to the Agreement for subsequent re-sale on any or all of the Flights.

(x)  'Base Date' means the base date for the Carrier's costs and expenses as specified in Schedule 1.

(xi)  'Carrier's Costs' means all of the Carrier's costs and expenses incurred or to be incurred in carrying out any Flight.

(xii)  'Regulatory Authority' means the United Kingdom Civil Aviation Authority or such other authority as may from time to time fulfill the functions of that Authority.

**2.0  Provision of Aircraft**

2.1  The Carrier shall provide the Aircraft at the commencement of each Flight properly manned, equipped and fuelled and during the period of the Flight shall operate the Aircraft in accordance with all applicable laws and regulations.

2.2  The Captain of the Aircraft shall have complete discretion concerning the preparation of the Aircraft for flight, the Flight, the Aircraft, the load carried and its distribution, including the number of passengers and the amount of their baggage, whether or not any particular passenger should be accepted for a Flight, whether or not a Flight shall be undertaken or abandoned once undertaken, any deviation from the proposed route and as to where landing should be made and all other matters relating to the operating of the Aircraft and the Charterer shall accept all such decisions of the Captain as final.  The Carrier shall not be liable to the Charterer for any loss (consequential or otherwise), damage, costs or claims of whatsoever nature and howsoever arising whether in contract or in tort (including negligence) or otherwise as a result of any of the decisions made pursuant to this condition.

**Aircraft Seat Charter Agreement**  

2.3  All ground and operating personnel including cabin staff are authorised to take orders only from the Carrier unless specific written agreement shall have been made between the parties whereby certain defined instructions may be accepted by such personnel from the Charterer.

2.4  The Carrier shall be entitled to utilise any part of the chartered space or seats not taken up by the Charterer for the carriage of Carriers personnel, equipment and spare parts.

**3.0  Substitution**

3.1  The Carrier shall be entitled following written notice to Charterer to substitute another aircraft for the Aircraft and the terms of this Agreement shall apply to any substituted aircraft.

3.2  The Carrier hereby reserves the right following written notice to Charterer to sub-contract all or any part of its obligations under the Agreement.

3.3  The Carrier is not a common carrier and does not accept the obligations of a common carrier. Any condition, warranty or representation concerning the Aircraft or its fitness for any carriage is hereby excluded.

**4.0  Operations**

4.1  Timings and dates specified in Schedule 2 to the Agreement are approximate and not guaranteed and shall not be binding on the Carrier. The Carrier reserves the right to deviate from the timings if in its opinion such deviation is desirable or necessary. The timings are also subject to the approval of the appropriate airport authorities at all points specified, whether scheduled or not.

4.2  The Charterer shall advise its passengers the minimum check in time applicable to each Flight which shall not be less than 2 hours prior to the scheduled time of departure shown in Appendix 2 (or such other time advised by prior notice by the Carrier to the Charterer) and the Carrier shall have no liability to or in respect of passengers who arrive after that time.

4.3  If any delay in the commencement or completion of any Flight is caused by the Charterer or anyone acting on its behalf, or any passenger carried or to be carried on any such Flight demurrage shall run against the Charterer for such delay at the rate specified in Schedule 1 and shall be charged to the Charterer for the whole period of the delay.

4.4  The Carrier shall not be obliged to delay a flight beyond its scheduled time of departure. If in the Carrier's opinion a passenger or his baggage will not be ready for embarkation in accordance with the Flight Schedule, the Carrier may permit the Aircraft to depart as scheduled and shall in no way be responsible for or to such passenger(s) or the Charterer but shall be deemed to have complied with its contractual obligations under the Agreement.

4.5  If an Aircraft is diverted from its destination airport for any reason outside the Carrier's control the Carrier shall be entitled to invoice the Charterer and the Charterer shall on demand reimburse the Carrier for any costs arising from the provision of a transfer service by alternative means of transport.

4.6  Should an Aircraft be diverted from its destination airport for any reason within the control of the Carrier, the Carrier shall arrange for the provision of a transfer service by alternative means of transport at the Carrier's own cost.

4.7  If the Aircraft is diverted at the request of the Charterer or for some other reason within the Charterer's control the Carrier shall be entitled to invoice the Charterer and the Charterer shall on demand reimburse the Carrier for any costs arising from the provision of a transfer service by alternative means of transport. Any service so provided by the Carrier is provided as agent for the Charterer, the passengers and persons interested in the goods carried on the Aircraft and the Carrier shall under no circumstances be liable for any acts or omissions of the providers of such transfer services.



Agreement No : 182 C First Class Corporation                              3

**Aircraft Seat Charter Agreement**                                    FLYJET

4.8     The Carrier shall not be responsible for the cost of provision of accommodation, refreshments, meals or any additional costs, losses or damage incurred in respect of passengers carried or to be carried due to any delay of any Flight whatsoever except that where such delays are a direct result of an Aircraft being unavailable due to technical or operational reasons within the control of the Carrier, then the Carrier shall provide at its own cost all meals, transport and hotels that may be reasonable in the circumstances. If the Aircraft is delayed as a result of circumstances outside the control of the Carrier, or at the direct request of the Charterer then the Charterer shall provide at its own cost all meals, transport and hotels that may be reasonable in the circumstances.

5.0     **Price and Payment**

5.1.1   Time shall be of the essence of each and every payment to be made pursuant to the Agreement.

5.1.2   Unless otherwise provided the Charter Price shall be deemed to be earned at the time of commencement of each Flight.

5.1.3   Any amounts not paid on the due date shall incur daily interest charges at the rate of 10% per annum.

5.1.4   The Carrier and Charterer agree that all payments to be made by the Charterer pursuant to this Agreement to the Carrier shall be made without any set-off, counterclaim, deduction, lien or withholding of any nature whatsoever.

5.2     The Charterer shall pay to the Carrier the Charter Price for all Flights set out in Schedule 2 as specified in Schedule 1 to the Agreement all such payments are to be made in US Dollars in cleared funds or such other currency as may be mutually agreed from time to time.

5.3     The Charter Price unless otherwise detailed in Schedule 1 does not include value added tax, Air Passenger Duty, airport and/or government passenger departure taxes or security levies or passenger insurance charges and is subject to variation in the event of any variance in or any new taxes, imposts and similar charges but shall be exclusive of any corporate or other taxes on the Carrier's net revenues. Any such amounts for which the Carrier is liable to account to the relevant authority shall be paid in respect of each flight by the Charterer to the Carrier at the date of payment of the Charter Price for such Flight, prior to the performance of such Flight, or within seven (7) days of invoice (whichever is applicable).

5.4     The Charter Price is based upon all of the Carrier's Costs and expenses and upon the currency exchange rates ruling on the Base Date

5.5     The Carrier shall be entitled to vary the Charter Price by a sum equal to any variance in the Carrier's Costs and expenses and/or any variations to the carrier in currency exchange rates, including for the avoidance of any doubt, any per passenger or other insurance surcharges levies or increased premium(s) since the Base Date incurred or to be incurred in operating any Flight.. The Carrier shall notify the Charterer in writing of any variance in the Charter Price not less than seven (7) days prior to the date of the Flight and the variance shall be paid at the same time as payment of the Charter Price for the Flight in accordance with the terms specified in Schedule 1 or within seven (7) days of such notification, whichever is the later.

5.6     The Charter Price shall cover the cost of operating the Aircraft including aircraft, passenger and third party liability insurances, aviation fuel, oils, charges, maintenance, landing, hangarage, parking, ground handling, aircraft navigation, catering, CAA charges and the remuneration and expenses of the Aircraft operating personnel. All other costs including but not limited to those identified in Condition 5.3 above shall be the responsibility of and paid by the Charterer.

6.0     **Traffic Documents**

Agreement No : 182 C First Class Corporation                                    4

**Aircraft Seat Charter Agreement**                                    FLYJET

6.1  The Charterer may issue its own Traffic Documents to passengers and Sub-Charterers only with the prior consent in writing of the Carrier and subject to such conditions as the Carrier may require. If the Carrier is to be responsible for the issue of Traffic Documents it will use its best endeavours to ensure the Charterer receives these in appropriate time. The Charterer shall ensure that the Traffic Documents are properly completed are delivered to the passengers and the owners of all goods carried in the Aircraft in timely fashion and if sent by post they shall be at the Charterer's risk.

6.2  Tickets may only be used by the passenger named thereon and are not transferable. The Carrier shall not be obliged to and may refuse to carry any passenger who is not in possession of a valid ticket for the applicable flight prior to its commencement. The Carrier reserves the right to require production of tickets by passengers prior to embarkation and at any time during the course of the Flight.

6.3  The Carrier's General Conditions of Carriage for Passengers and are incorporated by reference in the Traffic Documents and form part of the passenger's contract of carriage Baggage and are available for inspection by the Charterer who will ensure that same will be made available to passengers booking on the Flights. The Charterer shall enforce the provisions of such conditions at the request of and for the benefit of the Carrier. Carriage performed pursuant to this agreement shall be subject to and governed by the terms of this Agreement, the Traffic Documents of the Carrier and all applicable laws, regulations and directions made by the Regulatory Authority.

6.4  Carriage under this Agreement shall be subject to the rules and limitations relating to liability and to all other provisions established by the Montreal Convention 1999 ('the Convention') and/or by any other treaty applicable to such carriage. The Charterer shall take all such action as shall be necessary to afford to the Carrier and/or the actual carrier and/or their respective officers, employees and agents the full benefit of the Convention and any other applicable law relating to carriage by air. Except as otherwise provided in the Convention or such other applicable law the Carrier shall have no liability whatsoever for damage sustained in the event of the death of or injury to any passenger or in the event of the destruction, loss of or damage or delay to any baggage, cargo or mail.

6.5  The Charterer warrants that all passengers will hold all necessary passports, visas, health and other certificates to secure transit through any intermediate points and entry into the country of destination of the Flight and in the event that any authority refuses entry to any passenger(s) in any circumstances, then the costs of transporting that passenger(s) to any point deemed appropriate by such authorities together with the costs of accommodation, fines and charges of whatsoever nature arising from denied entry will be recharged to the Charterer and payable to the Carrier on demand.

6.6  The Charterer shall hold harmless and indemnify the Carrier against all claims, demands, liabilities, actions, proceedings, fines, costs and expenses of any kind whatsoever arising from or attributable to any default on the part of the Charterer or any Sub-Charterer or passenger in complying with the provisions of this Agreement.

6.7  The Carrier may in any event without liability to the Charterer or to any passenger:
6.7.1  Refuse to carry any passenger unless satisfied that any sub-charterer through whom any seats on that Flight have been made available to that passenger holds all requisite licences, permits or authorities entitling him to do so; and
6.7.2  Refuse to carry or remove en route if appropriate any passenger or his baggage where, in the exercise of its reasonable discretion, the Carrier decides that:
   (i)    such action is necessary for reasons of safety;
   (ii)   such action is necessary in order to comply with any applicable laws, regulations or orders of any state or country to be flown from, into or over;
   (iii)  the conduct, status, age or mental or physical condition of the passenger is such as to:
       • require special assistance of the Carrier,
       • cause discomfort or make himself objectionable to other passengers; or

**Aircraft Seat Charter Agreement** 

- involve any hazard or risk to himself or other persons or to property.
(iv) such action is necessary because the passenger has failed to observe the instructions of the Carrier.
(v) the passenger has failed to submit to or pass any security check;
(vi) the passenger's baggage has not been cleared by all appropriate baggage screening checks;
(vii) any monies due and owing to the Carrier from the Charterer under this Agreement remain unpaid;
(viii) the passenger does not appear to be properly documented;
(ix) the passenger may seek to enter a country through which he is in transit;
(x) the passenger may destroy his or her documentation during flight;
(xi) the passenger will not surrender travel documents to be held by the crew, against receipt, when so requested by the Carrier;
(xii) the person presenting the ticket cannot prove that he is the person named on the ticket or the ticket otherwise appears to have been acquired unlawfully or otherwise than from the Carrier or Charterer (if authorised by the Carrier to issue Traffic Documents in accordance with this Agreement); or
(xiii) the passenger is not in possession of a valid ticket or any part of the passenger's ticket has been mutilated, altered by anyone other than the Carrier or Charterer (if authorised to do so) or is presented without the passenger coupon and all unused flight coupons.

6.8 In the event that it is necessary in the Carrier's reasonable opinion for the Aircraft to be diverted in flight for the purpose of removing any passenger in accordance with the provisions of Condition 6.7 above (whether by reason of the passenger's conduct or physical or mental condition or for any other reason there set out), the Charterer shall indemnify the Carrier against any losses, costs, expenses, claims or liabilities which the carrier may incur as a result thereof. Any such amounts will be payable to Carrier upon demand.

**7.0 Cancellation**

7.1 The Charterer may cancel any of the Flights at any time provided it shall not make alternative arrangements for such Flight with another carrier and provided also that prior to such cancellation the Charterer has obtained the written agreement of all other Charterers co-chartering such Flight to the cancellation of the particular flight. Cancellation shall be conditional upon the immediate payment by the Charterer to the Carrier without demand of the cancellation charges specified in Schedule 1 hereto by the Charterer and all other Charterers co-chartering such Flight.

7.2 Cancellation shall only be effective when the Charterer has given written notice to the Carrier.

7.3 If the Charterer shall cancel 20% or more of the Flights within a Flight Series specified in Schedule 2 the Carrier shall be entitled at its discretion without liability to cancel all or any unperformed Flights in that Flight Series. In addition, in the event that at any time the total number of Flights cancelled by the Charterer represents more than 20% of the total number of Flights contracted to be chartered under this Agreement the Carrier shall have the right exercisable by giving 14 days prior notice in writing to the Charterer to terminate this Agreement.

7.4 Cancellation charges will be paid immediately upon cancellation by the Charterer. The Carrier shall be entitled to retain the whole of any non-refundable deposit referred to in Schedule 1 and shall be entitled to appropriate other amounts paid in advance by the Charterer against such cancellation charges. The Charterer will hold the Carrier harmless and indemnify the Carrier from claims by passengers, consignors and other persons having contracts with the Charterer or on whose behalf it has contracted should such claims arise from cancellation by the Charterer.

7.5 In the event that one or more of the Charterers are unable to perform their contractual obligations by reason of bankruptcy, liquidation, administration or receivership or other event

**Aircraft Seat Charter Agreement** 

of insolvency then, provided that reasonable notice is given to the remaining participants of the multiple charter, the Carrier reserves the right at its sole discretion to cancel the remaining affected Flights in the Flight Series.

**8.0  Assignment and Pledge**

8.1  The Charterer shall not be entitled to assign this Agreement or to sub-charter the Aircraft or any part thereof without the prior consent in writing of the Carrier and, in any case, only to the holders of all appropriate licences and authorities. Such consent shall not be unreasonably withheld or delayed by the Carrier.

8.2  The Charterer shall not be entitled to pledge the Aircraft or the credit of the Carrier for any purpose whatsoever.

8.3  The Agreement is entered into by the Charterer both on its own behalf and as agent for passengers, Sub-Charterers and owners of and other parties having or claiming any interest in any baggage and/or goods transported pursuant to this Agreement.

**9.0  Termination**

9.1  The Carrier shall be entitled to terminate this Agreement without prejudice to any other rights of the Carrier then accrued and howsoever arising if:
9.1.1  the Charterer fails to make payment on or before the due date or is in breach of any of its other obligations under this Agreement and fails to remedy such breach within 3 days of written notice from the Carrier;
9.1.2  the Charterer or any Sub-charterer shall cease to hold any requisite permission or authority;
9.1.3  in the case of the Charterer being a body corporate the Charterer takes any legal action or any legal proceedings have started or other steps taken for:-
  (i)  the winding up or dissolution of the Charterer, or
  (ii)  the appointment of a liquidator, trustee, administrator, administrative receiver or similar officer of the Charterer or of the whole or any part of its undertaking, assets, rights or revenues, or
  (iii)  the Charterer makes any general arrangement or composition with its creditors or ceases or threatens to cease to carry on business.
9.1.4  in the case of the Charterer being an individual or partnership the Charterer or any member of the partnership constituting the Charterer dies, become insolvent, becomes of unsound mind, commits any act of bankruptcy, has a receiving order made against him/her, is adjudicated bankrupt, has a bankruptcy petition presented or a bankruptcy order or interim order made against him/her or makes any general arrangement or composition with creditors or ceases or threatens to cease to carry on business.
9.1.5  if distress, execution, sequestration or other processes levied against or enforced upon or sued out against any of the assets, rights or revenues of the Charterer.

9.2  No waiver, series of waivers or forbearance by either of the parties hereto shall be deemed to be a waiver or forbearance of any prior or subsequent breach or constitute a modification of any of the terms, covenants or conditions contained herein. This Agreement shall only be varied by express written supplemental agreement signed by authorised officers of both parties.

9.3  If the Carrier is entitled to terminate this Agreement or any Flight subject to this Agreement and does so, the Carrier shall be entitled to levy cancellation charges calculated in accordance with the provision of this Agreement for any Flight(s) scheduled to operate after the date of termination of this Agreement as if the Flights had been cancelled by the Charterer at the date on which notice of cancellation was given by the Carrier to the Charterer.

**10.0  Limitation of Liability**

**Aircraft Seat Charter Agreement** 

10.1  The Carrier and its employees, servants and agents shall not be liable for any failure to perform any of the obligations of the Carrier pursuant to this Agreement in so far as that failure arises directly or indirectly from:

10.1.1  the act, neglect, default, omission or negligence of any sub-contractor or other person on whom the Carrier relies to perform any of its obligations hereunder;

10.1.2  labour disputes or strikes, whether actual or threatened, either of the Carrier's employees, agents or others upon whom the Carrier depends to perform its obligations hereunder;

10.1.3  any cause beyond control of the Carrier including but not limited to war, hostilities, terrorist activity, insurrection, civil commotion or rebellion (whether or not war has been declared), unusually severe weather, acts of god and accidents to or failure of the Aircraft or any part thereof or any machinery or apparatus in connection there with;

10.1.4  the refusal, untimely granting or withdrawal of any authorisation or permit required for the performance of any of the Flights;

10.1.5  lack of assurance of the availability of sufficient quantities of aviation fuel of the standard acceptable to the Carrier.

10.1.6  the unavailability, at a cost or on terms acceptable to the Carrier, of any insurance(s) required to be maintained by the Carrier for the operation of any Flight(s).

10.2  The Carrier shall not in any circumstances be liable for any consequential or special damage or loss arising from its performance or failure to perform the Flights or any of its obligations under this Agreement whether or not the Carrier has or should have knowledge that such damage or loss might be sustained.

**11.0  Performance**

11.1  The Carrier may perform a Flight only according to the terms and conditions of the operating licence issued to it by the Regulatory Authority or any further licence or authority which may be required for the performance of such Flight, whether under the laws and regulations of United Kingdom, the state of registration (if different) or any other state, to, from or over which the Aircraft will be flown in the course of such Flight. Provided the Charterer gives all information and necessary assistance in good time the Carrier will use it's best endeavours to procure all necessary licences or authorities, for the performance of the Flight(s). The Carrier's obligation to perform any particular Flight is conditional upon such licence or authority being granted.

11.2  The Carrier shall not be obliged to carry any passenger, baggage or cargo which does not comply with the Carrier's general conditions of carriage, all applicable customs, police, public health and other rules, regulations and licences of the United Kingdom and any other states over to or from which the Aircraft is flown.

**12.0  Applicable Law and Jurisdiction**

12.1  This Agreement wherever made or to be performed shall be governed and construed in accordance with English law and all disputes arising hereunder shall be submitted to the exclusive jurisdiction of the Courts of England and Wales.

**13.0  Entire Agreement**

13.1  This Agreement constitutes the entire Agreement of the parties with regard to their respective obligations and understandings. Neither party has relied upon any representation made to it by the other whether written or oral except as is expressly contained herein

**14.0  Notices**

14.1  Any notice required to given under this Agreement shall be sufficiently given and forwarded by registered post or fax to the address herein stated of the other party to whom it is to be given (or to such other address as communicated from time to time. Any and every notice so sent

**Aircraft Seat Charter Agreement** 

shall be deemed to have been received and given in the case of fax upon transmission and in the case or registered post within 48 hours of its posting.

### 15.0 Confidentiality

15.1 The parties acknowledge that this Agreement contains confidential information which if disclosed to third parties may cause commercial or other damage to either party. The Carrier and the Charterer mutually agree not (except as required by law) to disclose, discuss or communicate any of the provisions in this Agreement to third parties without the prior written consent of the other.

### 16.0 Severability

16.1 If any term or provision in this Agreement shall in whole or in part be held to any extent to be illegal or unenforceable under any enactment or rule of law, that term or provision or part shall to that extent be deemed not to form part of this Agreement and the enforceability of the remainder of this Agreement shall not be affected.

**Aircraft Seat Charter Agreement** 

**Schedule 1**

**Payment Terms**
The Charterer shall pay the total charter price for all Flights by way of cleared funds in Carrier's account by the due date as follows -
(1) A deposit equal to USD 250,000 by Tuesday 07th June 2005 to be held by Carrier and returned to Charterer without interest at the end of the charter term following reconciliation of all items under the Agreement.
(2) A further deposit of USD 500,000 by Friday 01st July 2005 to be held by Carrier and returned to Charterer without interest at the end of the charter term following reconciliation of all items under the Agreement.
(3) Payment by the 25th day of each month for all flights to be operated between the 01st and 15th day of the following month.
(4) Payment by the 10th day of each month for all flights to be operated between the 16th and 31st day of each month

All payments to be made to
Bank         Royal Bank of Scotland
Sort Code    15 10 00
Account      FLYJET-USDA
IBAN         GB89 RBOS 1663 000 2694 37
Beneficiary  Flyjet Limited

**Passenger Load Supplements**
(1) The charter prices detailed in Schedule 2 exclude passenger load supplements (including but not limited to Gatwick Airport passenger tax, UK Government Air Passenger Duty, war risk insurance, Bermuda passenger security tax, Bermuda Airport check in facility charge, Bermuda Airport passenger departure tax, Bermuda Airport passenger arrival tax, Bermuda Airport passenger screening service and Bermuda Airport passenger facility charge.
(2) Passenger load supplements shall be paid by the Charterer with each flight payment, on a 80% load basis, and reconciled to actual passengers carried post flight.

**Demurrage**
Pursuant to Condition 4.3, the demurrage rate shall be USD 5,000 per hour or part thereof.

**Cancellation Charges**
Pursuant to Condition 7, the Charterer may cancel up to 2 Flights per series of Flights on each day of the week detailed in Schedule 2 of the Agreement upon payment as follows –
(1) 0% for each Flight cancelled 60 days or more, prior to the scheduled departure date of such flight.
(2) 10% of the Charter Price for each Flight cancelled less than 60 days, but more than 42 days prior to the scheduled departure date of such Flight.
(3) 30% of the Charter Price for each Flight cancelled less than 42 days, but more than 21 days prior to the scheduled departure date of such Flight.
(4) 50% of the Charter Price for each Flight cancelled 21 days or less prior to the scheduled departure date of such Flight.
Any further Flights cancelled will incur cancellation charges equal to 50% of the Charter Price for each Flight cancelled.

**Base Date**
The applicable Base Date for varying Carrier's costs and exchange rates either up or down is 01st April 2005. The applicable Platts rate for aviation fuel cifnwe at that date was 551 usd/tonne.

**Other Terms**
(1) Pursuant to Condition 11 Charterer warrants to the Carrier that prior to the commencement of any marketing and sales activity in the United Kingdom on the contracted program it will have obtained either its own Air Travel Organiser's Licence (ATOL) issued by the United Kingdom Civil Aviation Authority or reached agreement with another ATOL holder for ATOL cover, and approved by the Civil Aviation Authority that the transactions contemplated by this Agreement will be within the terms of such Licence.

**Aircraft Seat Charter Agreement**



(2) Carrier will give Charterer all reasonable assistance in obtaining the necessary regulatory approvals and licences required for the operation of the charter program.

(3) In the event that Charterer and Carrier agree to make application to operate the Flights under a scheduled licence then Charterer will if applicable meet any additional financial fitness requirements imposed on Carrier by the Civil Aviation Authority for the operation of this program.

(4) This Agreement may be extended for a period of twelve months commencing on 01st November 2006 subject to Charterer giving Carrier written notice by 01st April 2006 and receipt by Charterer of Carriers written agreement to such extension by 30th April 2006. In the event that the Agreement is extended the Charter Price for each route during the extension period will increase by a percentage equal to the percentage change in the UK retail price index from 01st June 2005 to 01st October 2006

(5) This Agreement may be extended for a further period of twelve months commencing on 01st November 2007 subject to Charterer giving Carrier written notice by 01st April 2007 and receipt by Charterer of Carriers written agreement to such further extension by 30th April 2007. In the event that the Agreement is further extended the Charter Price for each route during the further extension period will increase by a percentage equal to the percentage change in the UK retail price index from 01st October 2006 to 01st October 2007.

(6) Charterer shall pay Carrier on demand for any agreed aircraft modifications including but not limited to Charterers passenger seats, and use of Charterers logo and branding on the aircraft hull, prior to commencement of the charter program as well as the costs of returning the aircraft to its original specification at the end of the contracted program. Payment to be made within seven (7) days of invoice.

(7) Charterer shall indemnify the Carrier for any Denied Boarding or other Compensation payable as a result of the Charterer issuing tickets in excess of the contracted capacity on the Flights, together with an administration charge of USD 150 per passenger affected.

(8) During the term of this Agreement Carrier and or its assigns will subject to Carriers recruitment policies employ Charterers Bermudan cabin crew, who will be trained to Carriers standard at Charterers cost.

(9) Charterer will give Carrier all assistance in crew training to ensure that Charterers product standards are met.

(10) Charterer will work with Carrier to plan Charterers program around Carriers scheduled maintenance downtime requirements.

SIGNED for and on behalf of the Carrier:

*[signature]*

Name: Shaun Dewey

Title: Director

Date: 07th June 2005

SIGNED for and on behalf of the Charterer:

*[signature]*

Name: Robert Masson

Title: PRESIDENT

**Aircraft Seat Charter Agreement**



Schedule 2.0

| FLIGHT NO | | DAY | STD (utc) | DEP | DES | STA (utc) | CAT | BAG ALL (kgs) | SEATS | CUR | SEAT PRICE | CHARTER PRICE USD | FROM | TO | FLTS | TOTAL SEATS | CONTRACT VALUE USD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **BOEING 767-200 ER** | | | | | | | | | | | | | | | | | |
| FJE | 566 | MON | 1200 | LGW | BDA | 2000 | HM | 20 | 110 | USD | | 131,000 | 05-Sep-05 | 30-Oct-06 | 61.0 | 6,710 | 7,991,000 |
| FJE | 567 | | 2300 | BDA | LGW | 0540 | HM | | | | | | | | | | |
| FJE | 566 | WED | 1200 | LGW | BDA | 2000 | HM | 20 | 110 | USD | | 131,000 | 07-Sep-05 | 25-Oct-06 | 60.0 | 6,600 | 7,860,000 |
| FJE | 567 | | 2300 | BDA | LGW | 0540 | HM | | | | | | | | | | |
| FJE | 566 | THU | 1200 | LGW | BDA | 2000 | HM | 20 | 110 | USD | | 131,000 | 01-Sep-05 | 26-Oct-06 | 61.0 | 6,710 | 7,991,000 |
| FJE | 567 | | 2300 | BDA | LGW | 0540 | HM | | | | | | | | | | |
| FJE | 566 | FRI | 1200 | LGW | BDA | 2000 | HM | 20 | 110 | USD | | 131,000 | 02-Sep-05 | 27-Oct-06 | 61.0 | 6,710 | 7,991,000 |
| FJE | 567 | | 2300 | BDA | LGW | 0540 | HM | | | | | | | | | | |
| FJE | 566 | SUN | 1200 | LGW | BDA | 2000 | HM | 20 | 110 | USD | | 131,000 | 04-Dec-05 | 29-Oct-06 | 48.0 | 5,280 | 6,288,000 |
| FJE | 567 | | 2300 | BDA | LGW | 0540 | HM | | | | | | | | | | |
| | | | | | | | | | | | | | | **TOTAL** | 291 | 32,010 | 38,121,000 |

For and on behalf of the Charter

Signature: _[signature]_

Name: S. Dewbry

Title: Director

Date: 07th June 2005

For and on behalf of the Charterer

Signature: _Robert Masson_

Name: Robert Masson

Title: President

Agreement No : 182 C First Class Corporation