**General Sales Agency Agreement**



BETWEEN:

**FLYJET LIMITED**
Sofitel London Gatwick
North Terminal
London-Gatwick Airport
West Sussex.
RH6 0PH
England

(herein referred to as 'the Carrier')

AND:

**FLY FIRST CLASS CORPORATION**
Ft Lauderdale International Airport
1100 Lee Wagener Boulevard- Suite 326
Ft. Lauderdale
Florida
33315
United States of America

(herein referred to as 'the GSA')

**WHEREAS:**

(A) the Carrier has applied for a licence from the appropriate authorities in the United Kingdom and Bermuda to operate a scheduled airline service between London-Stansted and Bermuda on a four times weekly basis with continuing fights on to Wilmington, North Carolina USA two times per week as detailed in Schedule 2 to commence sixty days after UK CAA regulatory approval utilising a specially configured Boeing 767-200 aircraft.

(B) the GSA wishes to sell the entire space on the Carrier's flights on the Route and underwrite the sales thereof on certain terms and the Carrier is willing and able to make available to the GSA space on the Flights subject to the terms of this Agreement.

**NOW IT IS HEREBY AGREED** as follows:

**1.0 Definitions**

1.1 The following definitions apply to this agreement unless the context otherwise requires:-

'Agreement' means this Aircraft General Sales Agency Agreement including these Clauses and the Schedules hereto.

'Aircraft' means the aircraft described in Schedule 2 to the Agreement or any alternative aircraft substituted under the terms of the Agreement.






'Base Date' means the base date for the Carrier's costs and expenses as specified in Schedule 1.
'Business Day' means a day on which banks in both London and New York are open for normal commercial business.

'Carrier' means Flyjet Limited

'Carrier's Costs' means all of the Carrier's costs and expenses incurred or to be incurred in carrying out any Flight

'Committed Price' means the Committed Price specified in Schedule 2 plus, without limitation, any applicable surcharges, airport and passenger taxes and service charges, security levies, UK Air Passenger Duty and aviation insurance surcharges

'Deposit' means the amount indicated as such in Schedule 1

'Flight' shall mean each of the flights specified in Schedule 2.

'GSA' means the party named as GSA in the Agreement.

'Regulatory Authority' means the United Kingdom Civil Aviation Authority or such other authority as may from time to time fulfill the functions of that Authority.

'Route' means the Carrier's duly authorised scheduled service route between the United Kingdom, Bermuda and Wilmington, North Carolina USA as stated in Schedule 2.

'Traffic Documents' means all passenger tickets and baggage checks, airwaybills and other documents issued or required under any applicable law or convention.

## 2.0 Provision of Aircraft

2.1 The Carrier shall provide the Aircraft at the commencement of each Flight properly crewed, maintained, equipped and fuelled and during the period of the Flight shall operate the Aircraft in accordance with all applicable laws and regulations.

2.2 The captain of the Aircraft shall have complete discretion concerning the preparation of the Aircraft for flight, the Flight, the Aircraft, the load carried and its distribution, including the number of passengers and the amount of their baggage, whether or not any particular passenger should be accepted for a Flight, whether or not a Flight shall be undertaken or abandoned once undertaken, any deviation from the proposed route and as to where landing should be made and all other matters relating to the operating of the Aircraft and the GSA shall accept all such decisions of the Captain as final. The Carrier shall not be liable to the GSA for any loss (consequential or otherwise), damage, costs or claims of whatsoever nature and howsoever arising whether in contract or in tort (including negligence) or otherwise as a result of any of the decisions made pursuant to this Clause.

2.3 All ground and operating personnel including cabin staff are authorised to take orders only from the Carrier unless specific written agreement shall have been made between the parties whereby certain defined instructions may be accepted by such personnel from the GSA.




2.4 The Carrier shall be entitled to utilise any part of the space or seats not taken up by the GSA for the carriage of Carriers personnel on duty travel, equipment and spare parts.

**3.0 Substitution**

3.1 The Carrier shall be entitled following agreement in writing from GSA not to be unreasonably withheld or delayed to substitute another aircraft for the Aircraft and the terms of this Agreement shall apply to any substituted aircraft.

3.2 The Carrier is not a common carrier and does not accept the obligations of a common carrier. Any clause, warranty or representation concerning the Aircraft or its fitness for any carriage is hereby excluded.

**4.0 Operations**

4.1 Flight timings and dates specified in Schedule 2 to the Agreement are approximate and not guaranteed (due for example weather, air traffic clearances and other factors affecting the operation on a day by day basis) and shall not be binding on the Carrier. The Carrier reserves the right to deviate from the timings if in its opinion such deviation is desirable or necessary. The timings are also subject to the approval of the appropriate airport authorities at all points specified, whether scheduled or not.

4.2 The GSA shall advise its passengers the minimum check in time applicable to each Flight which shall not be less than 90 minutes prior to the scheduled time of departure shown in Schedule 2 (or such other time advised by prior notice by the Carrier to the GSA) and the Carrier shall have no liability to or in respect of passengers who arrive after that time.

4.3 If an Aircraft is diverted from its destination airport for any reason outside the Carrier's control the Carrier shall be entitled to invoice the GSA and the GSA shall on demand reimburse the Carrier for any costs arising from the provision of a transfer service by alternative means of transport.

4.4 Should an Aircraft be diverted from its destination airport for any reason within the control of the Carrier, the Carrier shall arrange for the provision of a transfer service by alternative means of transport at the Carrier's cost.

4.5 If the Aircraft is diverted at the request of the GSA or for some other reason within the GSA's control the Carrier shall be entitled to invoice the GSA and the GSA shall on demand reimburse the Carrier for any costs arising from the provision of a transfer service by alternative means of transport. Any service so provided by the Carrier is provided as agent for the GSA, the passengers and persons interested in the goods carried on the Aircraft and the Carrier shall under no circumstances be liable for any acts or omissions of the providers of such transfer services.

4.6 Other than as required of EU Regulation 261/2004, the Carrier shall not be responsible for the cost of provision of accommodation, refreshments, meals or any additional costs, losses or damage incurred in respect of passengers carried or to be carried due to any delay of any Flight whatsoever except that where such delays are a direct result of an Aircraft being unavailable due to technical or operational reasons within the control of the Carrier, then the Carrier shall provide at its own cost all meals, transport and hotels that may be reasonable in the circumstances. If the Aircraft is delayed as a result of circumstances outside the control of






the Carrier, or at the direct request of the GSA then the GSA shall provide at its own cost all meals, transport and hotels that may be reasonable in the circumstances.

**5.0 Price, Payments and Commission**

5.1.1 Upon a passenger booking a seat on one of the Flights the GSA shall ensure that all monies due from such passenger in respect of his or her entitlement to be carried on such Flight are paid into a nominated escrow account or accounts in the name of the Carrier wherever appropriate and acceptable to the Regulatory Authority which funds shall be released either (i) to the GSA by way of sales commission in accordance with Clause 5.6 below or (ii) returned to the passenger either in the case of non operation of the Flight booked or in the case of cancellation of a booking by the passenger (subject to deduction of applicable cancellation fees).

5.1.2 Notwithstanding Clause 5.1.1 above, the GSA shall ensure that the Committed Price for each Flight is duly paid in accordance with Schedule 1 of this Agreement. The Committed Price shall be deemed to be earned at the time of commencement of each Flight.

5.1.3 Time shall be of the essence of each and every payment to be made pursuant to the Agreement. Any amounts not paid on the due date shall incur daily interest charges at the rate of ten (10) per cent per annum.

5.1.5 The Carrier and GSA agree that all payments to be made by the GSA pursuant to this Agreement to the Carrier shall be made without any set-off, counterclaim, deduction, lien or withholding of any nature whatsoever.

5.2 All such payments to be made hereunder shall be made in United States Dollars in cleared funds or such other currency as may be mutually agreed from time to time.

5.3 The Committed Price unless otherwise detailed in Schedule 1 does not include value added tax, UK Air Passenger Duty, airport and passenger taxes and service charges, security levies, UK Air Passenger Duty and aviation insurance surcharges and is subject to variation in the event of any variance in or any new taxes, imposts and similar charges but shall be exclusive of any corporate or other taxes on the Carrier's net revenues. Any such amounts for which the Carrier is liable to account to the relevant authority shall be paid in respect of each flight by the GSA to the Carrier at the date of payment of the Committed Price for such Flight, prior to the performance of such Flight, or within seven (7) days of invoice (whichever is applicable).

5.4 The Committed Price is based upon all of the Carrier's Costs and expenses and upon the currency exchange rates ruling on the Base Date and shall unless specifically varied elsewhere in this Agreement cover the cost of operating the Aircraft for the Flights including the provision of the aircraft, passenger and third party liability insurances, aviation fuel, oils, charges, maintenance, landing, hangarage, parking, ground handling, aircraft navigation, catering, CAA charges and the remuneration and expenses of the Aircraft operating personnel. All other costs including but not limited to those identified in Clause 5.3 above shall be the responsibility of and paid by the GSA

5.5 The Carrier and GSA agree to a fixed Committed Price based on the anticipated block hours between each city pair as indicated in Schedule 1. Each Quarter, Carrier and GSA agree to review the actual average route block hours and fuel burns from the




previous quarter and should the actual average block hours and fuel burns increase or decrease by more than 5%, Carrier and GSA will adjust the Committed Price either upwards or downwards. The Carrier shall be entitled to vary the Committed Price by a sum equal to any other variance in the Carrier's Costs and expenses and/or any variations to the Carrier in currency exchange rates, including for the avoidance of any doubt, any per passenger or other insurance surcharges levies or increased premium(s) since the Base Date incurred or to be incurred in operating any Flight. The Carrier shall notify the GSA in writing of any variance in the Committed Price not less than seven (7) days prior to the date of the Flight and the variance shall be paid at the same time as payment of the Committed Price for the Flight in accordance with the terms specified in Schedule 1 or within seven (7) days of such notification, whichever is the later.

5.6 On the next Business Day after the departure of each Flight the Carrier shall cause the applicable escrow bank or organisation to pay sales commission to the GSA in an amount equal to the monies received (inclusive of all taxes, fees and charges) by all passengers booked to depart on such Flight less any compensation payable in accordance with Article 7 of EU Regulation 261/2004 or costs of care in accordance with Article 9 of such Regulation where such costs have been incurred not as a result of matters within the Carriers control.

**6.0 Traffic Documents**

6.1 The GSA may issue its own Traffic Documents to passengers only with the prior consent in writing of the Carrier and subject to such Clauses as the Carrier may require. If the Carrier is to be responsible for the issue of Traffic Documents it will use its best endeavours to ensure the GSA receives these in appropriate time. The GSA shall ensure that the Traffic Documents are properly completed are delivered to the passengers and the owners of all goods carried in the Aircraft in timely fashion and if sent by post they shall be at the GSA's risk.

6.2 Tickets may only be used by the passenger named thereon and are not transferable. The Carrier shall not be obliged to and may refuse to carry any passenger who is not in possession of a valid ticket for the applicable flight prior to its commencement. The Carrier reserves the right to require production of tickets by passengers prior to embarkation and at any time during the course of the Flight.

6.3 The Carrier's General Conditions of Carriage for Passengers and Baggage from time to time in force shall be deemed to be incorporated by reference in the Traffic Documents and form part of the passenger's contract of carriage and are available for inspection by the GSA who will ensure that same will be made available to passengers booking the Flights. The GSA shall enforce the provisions of such conditions at the request of and for the benefit of the Carrier. Carriage performed pursuant to this agreement shall be subject to and governed by the terms of this Agreement, the Traffic Documents of the Carrier and all applicable laws, regulations and directions made by the Regulatory Authority.

6.4 Carriage under this Agreement shall be subject to the rules and limitations relating to liability and to all other provisions established by the Montreal Convention 1999 ('the Convention') and/or by any other treaty applicable to such carriage. The GSA shall take all such action as shall be necessary to afford to the Carrier and/or the actual carrier and/or their respective officers, employees and agents the full benefit of the Convention and any other applicable law relating to carriage by air. Except as




otherwise provided in the Convention or such other applicable law the Carrier shall have no liability whatsoever for damage sustained in the event of the death of or injury to any passenger or in the event of the destruction, loss of or damage or delay to any baggage, cargo or mail.

6.5 The GSA warrants that all passengers will hold all necessary passports, visas, health and other certificates to secure transit through any intermediate points and entry into the country of destination of the Flight and in the event that any authority refuses entry to any passenger(s) in any circumstances, then the costs of transporting that passenger(s) to any point deemed appropriate by such authorities together with the costs of accommodation, fines and charges of whatsoever nature arising from denied entry will be recharged to the GSA and payable to the Carrier on demand.

6.6 The GSA shall hold harmless and indemnify the Carrier against all claims, demands, liabilities, actions, proceedings, fines, costs and expenses of any kind whatsoever arising from or attributable to any default on the part of the GSA or passenger in complying with the provisions of this Agreement.

**7.0 Cancellation**

GSA may cancel up to ten (10) Flights at nil cost providing Carrier is given a minimum of sixty (60) days notice of such cancellation.
GSA may give to the Carrier not less than three (3) months notice of cancellation of this Agreement provided that in such case the Carrier shall, by way of liquidated damages and not as penalty, be entitled to retain the Deposit and be paid by the GSA such amount as represents the sum of 30% of the Committed Price for all Flights not operated as a result of such cancellation.
In the event that any Flight is cancelled then GSA shall provide passengers with an alternative travel booking or Carrier shall return all monies received from such passengers standing in the applicable escrow account.

**8.0 Assignment and Pledge**

8.1 The GSA shall not be entitled to assign this Agreement or to sub-charter the Aircraft or any part thereof without the prior consent in writing of the Carrier and, in any case, only to the holders of all appropriate licences and authorities. Such consent shall not be unreasonably withheld or delayed by the Carrier.

8.2 The GSA shall not be entitled to pledge the Aircraft or the credit of the Carrier for any purpose whatsoever.

8.3 The Agreement is entered into by the GSA both on its own behalf and as agent for passengers and owners of and other parties having or claiming any interest in any baggage and/or goods transported pursuant to this Agreement.

**9.0 Termination**

9.1 Either party shall be entitled to terminate this Agreement without prejudice to any other rights then accrued and howsoever arising if:






9.1.1 the other party fails to make payment on or before the due date or is in breach of any other of its obligations under this Agreement and fails to remedy such breach within 3 business days of written notice being given.

9.1.2 the other party shall cease to hold any requisite permission or authority;

9.1.3 the other party takes or suffers any legal action or any legal proceedings have started or other steps taken for:-

(i) the winding up or dissolution, or

(ii) the appointment of a liquidator, trustee, administrator, administrative receiver or similar officer of the whole or any part of its undertaking, assets, rights or revenues, or

(iii) it makes any general arrangement or composition with its creditors or ceases or threatens to cease to carry on business.

9.1.4 if distress, execution, sequestration or other processes levied against or enforced upon or sued out against any of the assets, rights or revenues of the other party.

9.2 No waiver, series of waivers or forbearance by either of the parties hereto shall be deemed to be a waiver or forbearance of any prior or subsequent breach or constitute a modification of any of the terms, covenants or clauses contained herein. This Agreement shall only be varied by express written supplemental agreement signed by authorised officers of both parties.

9.3 If the Carrier becomes entitled to terminate this Agreement and does so, the Carrier shall be entitled to retain the Deposit and be paid by the GSA such amount as represents 30% of the Committed Price for all Flights not operated as a result of such termination. If the GSA becomes entitled to terminate this Agreement under the provisions of this clause, the Carrier shall repay the Deposit to the GSA. In the event that either party terminates this Agreement under the provisions of this clause, the Carrier shall return all monies received from passengers standing in the applicable escrow account.

## 10.0 Limitation of Liability

10.1 The Carrier and its employees, servants and agents shall not be liable for any failure to perform any of the obligations of the Carrier pursuant to this Agreement in so far as that failure arises directly or indirectly from:

10.1.1 the act, neglect, default, omission or negligence of any sub-contractor or other person on whom the Carrier relies to perform any of its obligations hereunder;

10.1.2 labour disputes or strikes, whether actual or threatened, either of the Carrier's employees, agents or others upon whom the Carrier depends to perform its obligations hereunder;

10.1.3 any cause beyond control of the Carrier including but not limited to war, hostilities, terrorist activity, insurrection, civil commotion or rebellion (whether or not war has been declared), unusually severe weather, acts of God and accidents to or failure of the Aircraft or any part thereof or any machinery or apparatus in connection there with;

10.1.4 the refusal, untimely granting or withdrawal of any authorisation or permit required for the performance of any of the Flights;

10.1.5 lack of assurance of the availability of sufficient quantities of aviation fuel of the standard acceptable to the Carrier.

10.1.6 the unavailability, at a cost or on terms acceptable to the Carrier, of any insurance(s) required to be maintained by the Carrier for the operation of any Flight(s).

10.2 The Carrier shall not in any circumstances be liable for any consequential or special damage or loss arising from its performance or failure to perform the Flights or any of its obligations under this Agreement whether or not the Carrier has or should have knowledge that such damage or loss might be sustained.






**11.0 Performance**

11.1 The Carrier may perform a Flight only according to the terms and Clauses of the operating licence issued to it by the Regulatory Authority or any further licence or authority which may be required for the performance of such Flight, whether under the laws and regulations of United Kingdom, the state of registration (if different) or any other state, to, from or over which the Aircraft will be flown in the course of such Flight. Provided the GSA gives all information and necessary assistance in good time the Carrier will use its best endeavours to procure all necessary licences or authorities, for the performance of the Flight(s). The Carrier's obligation to perform any particular Flight is Clauseal upon such licence or authority being granted.

11.2 The Carrier shall not be obliged to carry any passenger, baggage or cargo which does not comply with the Carrier's general Clauses of carriage, all applicable customs, police, public health and other rules, regulations and licences of the United Kingdom and any other states over to or from which the Aircraft is flown.

**12.0 Applicable Law and Jurisdiction**

12.1 This Agreement wherever made or to be performed shall be governed and construed in accordance with English law and all disputes arising hereunder shall be submitted to the exclusive jurisdiction of the Courts of England and Wales.

**13.0 Entire Agreement**

13.1 This Agreement constitutes the entire Agreement of the parties with regard to their respective obligations and understandings. Neither party has relied upon any representation made to it by the other whether written or oral except as is expressly contained herein

**14.0 Notices**

14.1 Any notice required to given under this Agreement shall be sufficiently given and forwarded by registered post or fax to the address herein stated of the other party to whom it is to be given (or to such other address as communicated from time to time. Any and every notice so sent shall be deemed to have been received and given in the case of fax upon transmission and in the case or registered post within 48 hours of its posting.

**15.0 Confidentiality**

15.1 The parties acknowledge that this Agreement contains confidential information which if disclosed to third parties may cause commercial or other damage to either party. The Carrier and the GSA mutually agree not (except as required by law) to disclose,





discuss or communicate any of the provisions in this Agreement to third parties without the prior written consent of the other.

**16.0 Severability**

16.1 If any term or provision in this Agreement shall in whole or in part be held to any extent to be illegal or unenforceable under any enactment or rule of law, that term or provision or part shall to that extent be deemed not to form part of this Agreement and the enforceability of the remainder of this Agreement shall not be affected.

SIGNED for and on behalf of the Carrier:

..............................................................

Name: Shaun Dewey

Title: Director

Date: 18th January 2006

SIGNED for and on behalf of the GSA:

..............................................................

Name: DARRELL PICHARDSON

Title: CHIEF EXECUTIVE OFFICER




**Schedule 1**

**Payment Terms**

The GSA shall pay the total Committed Price for all Flights by way of cleared funds in Carrier's account by the due date as follows -

(1) A deposit equal to USD 250,000 by Tuesday 07th June 2005 to be held by Carrier and returned to GSA without interest at the end of the agreement term following reconciliation of all items under the Agreement (receipt of which is hereby acknowledged).

(2) A further deposit of USD 500,000 by Friday 01st July 2005 to be held by Carrier and returned to GSA without interest at the end of the agreement term following reconciliation of all items under the Agreement receipt of which is hereby acknowledged).

(3) GSA will make payment to Carrier for the sector guarantee regardless of the number of passengers booked (eg equivalent of a Committed Price, plus taxes, security, apd and war risk insurance initially based on a 80% load factor and reconciled post flight) for all sectors to be operated by Carrier in each week Thursday to Wednesday inclusive Payment to be received by Carrier each Thursday seven (7) days prior.

All payments shall be made to:

| | | |
|---|---|---|
| Bank | : | Royal Bank of Scotland plc |
| Sort Code | : | 15-10-00 |
| Account | : | FYJET-USDA |
| IBAN | : | GB89 RBOS 1663 0000 2694 37 |
| Beneficiary | : | Flyjet Limited |

**Passenger Load Supplements**

(1) The Committed Prices detailed in Schedule 2 exclude passenger load supplements (including but not limited to London-Stansted Airport passenger service charge, UK Air Passenger Duty, war risk insurance, Bermuda passenger security tax, Bermuda Airport check in facility charge, Bermuda Airport passenger departure tax, Bermuda Airport passenger arrival tax, Bermuda Airport passenger screening service, Bermuda Airport passenger facility charge, Wilmington International Airport passenger security tax, check in facility charge, departure tax, arrival tax and passenger screening service.

(2) Passenger load supplements shall be paid by the GSA with each flight payment, on an 80% load basis, and reconciled to actual passengers carried post flight.

**Base Date**

The applicable Base Date for varying Carrier's costs and exchange rates either up or down is 01st April 2005. The applicable Platts CIFNWE rate for aviation fuel at that date was 551 usd/tonne.

**Additional Provisions**

(1) GSA will (if applicable) meet any additional financial fitness requirements imposed on Carrier by the Civil Aviation Authority for the operation of the Fights.




(2) This Agreement may be extended for a period of twelve months commencing at the beginning of the IATA 2007 summer season on Sunday 25th March 2007 by the GSA giving Carrier written notice by 1st September 2006 and receipt by GSA of Carrier's written agreement to such extension by 30th September 2006. In the event that the Agreement is extended the Committed Price for each route excluding the cost of aviation fuel during the extension period will increase by a percentage equal to the percentage change in the UK retail price index from 01st June 2005 to 30th September 2006.

(3) This Agreement may be extended for a further period of twelve months commencing at the beginning of the IATA 2008 summer season on Sunday 30th March 2008 by the GSA giving Carrier written notice by 1st September 2007 and receipt by GSA of Carriers written agreement to such further extension by 30th September 2007. In the event that the Agreement is further extended the Committed Price for each route excluding the cost of aviation fuel during the further extension period will increase by a percentage equal to the percentage change in the UK retail price index from 01st October 2006 to 30th September 2007

(4) The GSA shall pay the Carrier on demand for any agreed aircraft modifications including but not limited to GSA's passenger seats, and use of GSA's logo and branding on the aircraft hull, prior to commencement of the Flights as well as the costs of returning the aircraft to its original specification at the end of the contracted program. Payment shall be made within seven (7) days of invoice.

(5) The GSA shall indemnify the Carrier for any Denied Boarding or other compensation payable under applicable law as a result of the GSA issuing tickets in excess of the contracted capacity on the Flights.

(6) The GSA will give the Carrier all assistance in crew training to ensure that the GSA's product standards are met.

(7) The GSA will co-ordinate with the Carrier to plan Flights around Carrier's scheduled maintenance downtime requirements. Any scheduled maintenance task that will require downtime that affects the Flights detailed in Schedule 2, must be advised to GSA no less than 60 days in advance of such scheduled maintenance event.

(8) GSA and Carrier both agree wherever possible to provide to the other not less than 30 days notice of a proposed schedule change. GSA acknowledges that any change resulting in an increase in cost to Carrier will be reflected by way of an increase in Committed Price charged by Carrier.

(9) All cargo revenue and associated costs will be to the account of the GSA.

(10) Carrier shall maintain or shall cause to be maintained in full force and effect, at all times during the term of this Agreement, policies of insurance with limits and coverage commercially reasonable in the airline industry, including a general liability policy with a limit not less than seven hundred and fifty million United States Dollars (USD 750,000,000). GSA shall on request, be provided customary certificates of insurance whereby GSA will be an additional named insured.

(11) Prior to commencement of the Flights Carrier and GSA will jointly produce (i) an 'Interface Procedure', (ii) a 'Customer Service Schedule, (iii) a 'Service Level Agreement' and (iv) a Staff Travel and Interline Policy.




(12) Carrier and GSA will jointly work to reduce the costs of handling, landing and other operational costs. All airport marketing rebates and incentives relating to the Flights will be to the account of GSA.

SIGNED for and on behalf of the Carrier:

[signature]

Name: Shaun Dewey

Title: Director

Date: 18th January 2006

SIGNED for and on behalf of the GSA:

Darrell Richardson

Name: DARRELL RICHARDSON

Title: Chief Exective Officer

**General Sales Agency Agreement**



**Schedule 2.3**

| FLIGHT NO | DAY | STD (utc) | DEP | DES | STA (utc) | CAT | BAG ALL (kgs) | SEATS | CUR | SEAT PRICE | CHARTER PRICE USD | FROM | TO | FLTS | TOTAL SEATS | CONTRACT VALUE USD |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **IATA WINTER SEASON 2005/6 - BOEING 767-200 ER** | | | | | | | | | | | | | | | | |
| FJE 558 | MON | 1000 | STN | BDA | 1800 | HM | 20 | 90 | USD | | 69,000 | 06-Mar-06 | 20-Mar-06 | 3.0 | 270 | 207,000 |
| FJE 559 | MON | 2355 | BDA | STN | 0640 | HM | 20 | 90 | USD | | 69,000 | 06-Mar-06 | 20-Mar-06 | 3.0 | 270 | 207,000 |
| FJE 558 | THU | 0845 | STN | BDA | 1645 | HM | 20 | 90 | USD | | 69,000 | 09-Mar-06 | 23-Mar-06 | 3.0 | 270 | 207,000 |
| FJE 559 | THU | 2355 | BDA | STN | 0640 | HM | 20 | 90 | USD | | 69,000 | 09-Mar-06 | 23-Mar-06 | 3.0 | 270 | 207,000 |
| FJE 556 | FRI | 0845 | STN | BDA | 1645 | HM | 20 | 90 | USD | | 69,000 | 10-Mar-06 | 24-Mar-06 | 3.0 | 270 | 207,000 |
| FJE 556 | FRI | 1800 | BDA | ILM | 2030 | HM | 20 | 90 | USD | | 26,000 | 10-Mar-06 | 24-Mar-06 | 3.0 | 270 | 78,000 |
| FJE 557 | FRI | 2200 | ILM | BDA | 0005 | HM | 20 | 90 | USD | | 26,000 | 10-Mar-06 | 24-Mar-06 | 3.0 | 270 | 78,000 |
| FJE 557 | SAT | 0120 | BDA | STN | 0800 | HM | 20 | 90 | USD | | 69,000 | 11-Mar-06 | 25-Mar-06 | 3.0 | 270 | 207,000 |
| FJE 556 | SUN | 0845 | STN | BDA | 1645 | HM | 20 | 90 | USD | | 69,000 | 12-Mar-06 | 19-Mar-06 | 2.0 | 180 | 138,000 |
| FJE 556 | SUN | 1800 | BDA | ILM | 2030 | HM | 20 | 90 | USD | | 26,000 | 12-Mar-06 | 19-Mar-06 | 2.0 | 180 | 52,000 |
| FJE 557 | SUN | 2200 | ILM | BDA | 0005 | HM | 20 | 90 | USD | | 26,000 | 12-Mar-06 | 19-Mar-06 | 2.0 | 180 | 52,000 |
| FJE 557 | MON | 0120 | BDA | STN | 0800 | HM | 20 | 90 | USD | | 69,000 | 13-Mar-06 | 20-Mar-06 | 2.0 | 180 | 138,000 |
| **IATA SUMMER SEASON 2007 - BOEING 767-200 ER** | | | | | | | | | | | | | | | | |
| FJE 558 | MON | 0900 | STN | BDA | 1700 | HM | 20 | 90 | USD | | 69,000 | 27-Mar-06 | 23-Oct-06 | 31.0 | 2,790 | 2,139,000 |
| FJE 559 | MON | 2255 | BDA | STN | 0540 | HM | 20 | 90 | USD | | 69,000 | 27-Mar-06 | 23-Oct-06 | 31.0 | 2,790 | 2,139,000 |
| FJE 558 | THU | 0745 | STN | BDA | 1545 | HM | 20 | 90 | USD | | 69,000 | 30-Mar-06 | 26-Oct-06 | 31.0 | 2,790 | 2,139,000 |
| FJE 559 | THU | 2255 | BDA | STN | 0540 | HM | 20 | 90 | USD | | 69,000 | 30-Mar-06 | 26-Oct-06 | 31.0 | 2,790 | 2,139,000 |
| FJE 556 | FRI | 0745 | STN | BDA | 1545 | HM | 20 | 90 | USD | | 69,000 | 31-Mar-06 | 27-Oct-06 | 31.0 | 2,790 | 2,139,000 |
| FJE 556 | FRI | 1700 | BDA | ILM | 1930 | HM | 20 | 90 | USD | | 26,000 | 31-Mar-06 | 27-Oct-06 | 31.0 | 2,790 | 806,000 |
| FJE 557 | FRI | 2100 | ILM | BDA | 2305 | HM | 20 | 90 | USD | | 26,000 | 31-Mar-06 | 27-Oct-06 | 31.0 | 2,790 | 806,000 |
| FJE 557 | SAT | 0020 | BDA | STN | 0700 | HM | 20 | 90 | USD | | 69,000 | 01-Apr-06 | 28-Oct-06 | 31.0 | 2,790 | 2,139,000 |
| FJE 556 | SUN | 0745 | STN | BDA | 1545 | HM | 20 | 90 | USD | | 69,000 | 26-Mar-06 | 22-Oct-06 | 31.0 | 2,790 | 2,139,000 |
| FJE 556 | SUN | 1700 | BDA | ILM | 1930 | HM | 20 | 90 | USD | | 26,000 | 26-Mar-06 | 22-Oct-06 | 31.0 | 2,790 | 806,000 |
| FJE 557 | SUN | 2100 | ILM | BDA | 2305 | HM | 20 | 90 | USD | | 26,000 | 26-Mar-06 | 22-Oct-06 | 31.0 | 2,790 | 806,000 |
| FJE 557 | MON | 0020 | BDA | STN | 0700 | HM | 20 | 90 | USD | | 69,000 | 27-Mar-06 | 23-Oct-06 | 31.0 | 2,790 | 2,139,000 |
| **IATA WINTER SEASON 2006/7 - BOEING 767-200 ER** | | | | | | | | | | | | | | | | |
| FJE 558 | MON | 1000 | STN | BDA | 1800 | HM | 20 | 90 | USD | | 69,000 | 30-Oct-06 | 19-Mar-07 | 21.0 | 1,890 | 1,449,000 |
| FJE 559 | MON | 2355 | BDA | STN | 0640 | HM | 20 | 90 | USD | | 69,000 | 30-Oct-06 | 19-Mar-07 | 21.0 | 1,890 | 1,449,000 |
| FJE 558 | THU | 0845 | STN | BDA | 1645 | HM | 20 | 90 | USD | | 69,000 | 02-Nov-06 | 22-Mar-07 | 21.0 | 1,890 | 1,449,000 |
| FJE 559 | THU | 2355 | BDA | STN | 0640 | HM | 20 | 90 | USD | | 69,000 | 02-Nov-06 | 22-Mar-07 | 21.0 | 1,890 | 1,449,000 |
| FJE 556 | FRI | 0845 | STN | BDA | 1645 | HM | 20 | 90 | USD | | 69,000 | 03-Nov-06 | 23-Mar-07 | 21.0 | 1,890 | 1,449,000 |
| FJE 556 | FRI | 1800 | BDA | ILM | 2030 | HM | 20 | 90 | USD | | 26,000 | 03-Nov-06 | 23-Mar-07 | 21.0 | 1,890 | 546,000 |
| FJE 557 | FRI | 2200 | ILM | BDA | 0005 | HM | 20 | 90 | USD | | 26,000 | 03-Nov-06 | 23-Mar-07 | 21.0 | 1,890 | 546,000 |
| FJE 557 | SAT | 0120 | BDA | STN | 0800 | HM | 20 | 90 | USD | | 69,000 | 04-Nov-06 | 24-Mar-07 | 21.0 | 1,890 | 1,449,000 |
| FJE 556 | SUN | 0845 | STN | BDA | 1645 | HM | 20 | 90 | USD | | 69,000 | 29-Oct-06 | 18-Mar-07 | 21.0 | 1,890 | 1,449,000 |
| FJE 556 | SUN | 1800 | BDA | ILM | 2030 | HM | 20 | 90 | USD | | 26,000 | 29-Oct-06 | 18-Mar-07 | 21.0 | 1,890 | 546,000 |
| FJE 557 | SUN | 2200 | ILM | BDA | 0005 | HM | 20 | 90 | USD | | 26,000 | 29-Oct-06 | 18-Mar-07 | 21.0 | 1,890 | 546,000 |
| FJE 557 | MON | 0120 | BDA | STN | 0800 | HM | 20 | 90 | USD | | 69,000 | 30-Oct-06 | 19-Mar-07 | 21.0 | 1,890 | 1,449,000 |
| | | | | | | | | | | | | | TOTAL | 656 | 59,040 | 35,890,000 |

| For and on behalf of the Carrier | | For and on behalf of the GSA | |
|---|---|---|---|
| Signature | [signature] | Signature | [signature] |
| Name | J. DEWEY. | Name | DARRELL RICHARDSON |
| Title | DIRECTOR | Title | CHIEF EXECUTIVE OFFICER |
| Date | 18TH JANUARY 2006. | | |

Agreement No : 182 Fly First Class Corporation